**In the Matter of Oliver Ray VALENTINE, Jr.**

Supreme Court of Tennessee, at Jackson.

July 19, 2002.

Debra N. Brittenum, Nancy Percer Kessler, and Webb Alexander Brewer, Memphis, Tennessee, for the appellants, Chanya Wallace and Oliver Ray Valentine, Sr.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, for the appellees, CASA and Tennessee Department of Human Services.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, Jr., and WILLIAM M. BARKER, JJ., joined.

This termination of parental rights case presents two issues for review: 1) whether reversal is required on constitutional or procedural grounds because a juvenile court referee presided over the hearing as a special judge; and 2) whether clear and convincing evidence exists to support the special judge's decision to terminate parental rights. We hold that the appointment of a juvenile court referee as a special judge under Tenn.Code Ann. § 17–2–118(f)(2) does not contravene the provision in Article VI, § 4 of the Tennessee Constitution requiring that a judge be elected and that there was no procedural error in the appointment of the special judge in this case. We further hold that the grounds for termination have not been proven by clear and convincing evidence. Accordingly, we reverse the judgment of the trial court and remand for further proceedings.

## BACKGROUND

On March 23, 1994, Oliver Ray Valentine, Jr., was born to Chanya Wallace and Oliver Ray Valentine, Sr. When Oliver was twenty months old, the Tennessee Department of Children's Services (DCS) removed him from the custody of Ms. Wallace because she had beaten him. These beatings caused bruises on his back, chest, head, and face. Approximately two months later, the Shelby County Juvenile Court determined that Oliver was a dependent and neglected child and placed him in the custody of DCS. Oliver has resided in foster care since that time.

From January 1996 to June 1998, DCS presented Ms. Wallace with four perma-

nency plans.[1] The first three plans required Ms. Wallace to do the following: 1) attend parenting classes, 2) attend vocational classes or obtain a GED, 3) maintain appropriate, stable housing for at least six months, and 4) maintain supervised visitation with Oliver for a minimum of four hours monthly. Ms. Wallace completed parenting classes but was referred to a second program because she showed a lack of retention of the information. Ms. Wallace did not attend vocational classes or obtain a GED. She reported six different addresses from 1996 to 1998. Her visitation with Oliver was irregular and inconsistent.

The final permanency plan presented in June 1998 incorporated the same responsibilities for Ms. Wallace as in the prior three plans and added two more requirements: 1) attend individual counseling, and 2) undergo a neuropsychiatric evaluation. According to DCS, the additional requirements should have been included in the prior plans but had been omitted through oversight. The goal was changed from family reunification to adoption because Ms. Wallace had not complied with her responsibilities under the prior plans. The petition to terminate parental rights was filed a month later.

By the time of the termination hearing in September 1999, Ms. Wallace had completed the second parenting class program. She started a GED class but quit after she obtained a job. She had lived at the same address, a rooming house, for approximately sixteen months. She visited Oliver regularly in the year before the hearing, missing just one scheduled supervised visitation. Although Ms. Wallace met twice in August 1998 with a psychiatrist at the mental health center to which DCS referred her, she did not continue because she was receiving other counseling. The psychiatrist to whom Ms. Wallace was referred by DCS saw no cause to refer her for a neuropsychiatric evaluation.

Ms. Wallace and Mr. Valentine married in April 1999 and were living together at the time of the termination hearing. Ms. Wallace acknowledged that Mr. Valentine had beaten her in the past but claimed that no domestic violence had occurred since January 1999.

Ms. Wallace testified at the termination hearing that she had learned a valuable lesson about beating Oliver and that parenting classes had taught her about using a "time-out" to discipline a child. Ms. Wallace's mother and Ms. Wallace's sister, who had made the report to DCS that led to Oliver's removal, confirmed that Ms. Wallace had improved her parenting skills and was entrusted with family members' children.

The trial court found that Ms. Wallace failed to attend parenting classes, participate in vocational classes or obtain a GED, maintain stable housing, and maintain a supervised visitation schedule. The trial court made no finding regarding the requirements in the last permanency plan that Ms. Wallace attend individual counsel-

---

1. A permanency plan is a written plan for a child placed in foster care. The plan sets out requirements to achieve family reunification or other appropriate goals, such as adoption or permanent foster care. Tenn.Code Ann. §§ 37–2–402(8), –403(a)(1). The requirements must be stated in specific terms and must be reasonably related to the specified goal. Tenn.Code Ann. § 37–2–403(a)(2)(A). Within ninety (90) days of the date of foster care placement and no less often than every six (6) months thereafter, the plan is reviewed to assess, among other things, compliance with the requirements and project a likely date on which the goal of the plan will be achieved. Tenn.Code Ann. § 37–2–404(b). In this case, successive plans were presented to Ms. Wallace to allow her additional time to comply with the requirements.

ing and undergo a neuropsychiatric evaluation. The trial court then concluded that: 1) Ms. Wallace had substantially failed to comply with her responsibilities under the permanency plan; and 2) the conditions that led to Oliver's removal still persisted, these conditions were unlikely to be remedied, and the continuation of Ms. Wallace's parental relationship with Oliver greatly diminished his chances of integration into a stable home. The trial court terminated Ms. Wallace's parental rights based upon these two grounds.[2] The Court of Appeals affirmed the trial court. We granted permission to appeal.

## SPECIAL JUDGE

■ Ms. Wallace argues that reversal is required because George E. Blancett, a juvenile court referee, presided over the termination hearing as a special judge. She challenges his appointment on both constitutional and procedural grounds. Her constitutional argument is that Tenn. Code Ann. § 17–2–118(f)(2), which was enacted under the authority of Article VI, § 11 of the Tennessee Constitution, gives elected judges unfettered discretion to delegate adjudicatory functions to non-judges and therefore contravenes Article VI, § 4 of the Tennessee Constitution.[3] We disagree.

**2.** These same grounds were used to terminate Mr. Valentine's parental rights. Mr. Valentine's parental rights are not at issue in this appeal.

**3.** Ms. Wallace also challenges the constitutionality of Tenn.Code Ann. § 17–2–122, a statute which is similar to § 17–2–118(f)(2). This issue is waived because it was raised for the first time in this Court. *See Lawrence v. Stanford,* 655 S.W.2d 927, 929 (Tenn.1983).

**4.** A substitute judge may not preside over a case without a consent form signed by all litigants who are present at the beginning of

Article VI, § 4 of the Tennessee Constitution provides in pertinent part:

The Judges of the Circuit and Chancery Courts, and of other inferior Courts, shall be elected by the qualified voters of the district or circuit to which they are to be assigned.

Article VI, § 11 of the Tennessee Constitution provides in pertinent part:

The Legislature may by general laws make provision that special Judges may be appointed, to hold any Courts the Judge of which shall be unable or fails to attend or sit; or to hear any cause in which the Judge may be incompetent.

Section 17–2–118 of the Tennessee Code Annotated provides that, for good cause, a state judge or a county judge of a court of record may appoint a substitute judge. Good cause includes illness, physical incapacitation, vacation, or absence from the city or judicial district related to the judge's judicial office. Tenn.Code Ann. § 17–2–118(a). The substitute judge must possess all of the qualifications of a judge of the court in which the substitute is appointed. Tenn.Code Ann. § 17–2–118(b). A consent form must be signed by all litigants.[4] These requirements of the statute do not apply, however,

*where a judge finds it necessary to be absent from holding court, and appoints as a substitute judge:*

the proceeding. Tenn.Code Ann. § 17–2–118(e). The consent form must reflect that the substitute judge has not been duly elected by the citizens of the judicial district or appointed by the governor but has been appointed pursuant to this section, must include the name of the lawyer appointed as substitute judge, the judge of the court in which such substitute judge is sitting, the date for which the substitute was appointed, and the reason for the regular judge's absence. *Id.* The consent form must be transmitted to the Administrative Office of the Courts and maintained on file for public inspection. *Id.*

(1) A duly elected or appointed judge of any inferior court;

(2) *A full-time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile referee, a* child support referee or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. Such judicial officer shall only serve as a special judge in matters related to that officer's duties as a judicial officer.

Notwithstanding the provisions of subsections (a)-(e), a judge shall have the authority to appoint a substitute judge as provided in this subsection.

Tenn.Code Ann. § 17–2–118(f) (Emphasis added.)

■ Ms. Wallace concedes that no inherent conflict exists between Article VI, § 4, requiring the election of judges, and Article VI, § 11, or the statutes enacted thereunder regarding the appointment of special judges. She claims, however, that § 17–2–118(f)(2) runs afoul of Article VI, § 4 by placing no restrictions on the use of special judges. The appointment of special judges under subsection (f) of the statute is limited to circumstances "where a judge finds it necessary to be absent from holding court." Tenn.Code Ann. § 17–2–118(f)(2). Construing this provision, we recently stated that an elected judge's discretion to appoint special judges under § 17–2–118(f)(2) is limited by the requirement that the elected judge's absence be "necessary" in the sense of being indispensable and not just convenient. *Ferrell*

*v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 737–738 (Tenn.2000). Because Tenn. Code Ann. § 17–2–118(f)(2) provides reasonable restrictions upon the appointment of special judges, the statute does not give elected judges unfettered discretion as claimed by Ms. Wallace. Her constitutional argument based on that premise therefore must fail. Moreover, Ms. Wallace does not argue that the elected judge's absence was not "necessary" in this case. Accordingly, we hold that the appointment of a juvenile court referee as a special judge under Tenn.Code Ann. § 17–2–118(f)(2) does not contravene the provision in Article VI, § 4 of the Tennessee Constitution requiring that a judge be elected.

■ We next determine whether the proper procedure for appointing a special judge was followed in this case. Ms. Wallace initially challenges the general authority of Blancett to sit as a special judge because he did not articulate the basis for his authority and there is no order in the record appointing him as special judge. At the beginning of the termination hearing, counsel for Ms. Wallace recognized that Blancett was authorized to sit as a special judge under § 17–2–118(f)(2).[5] The objection was only to his hearing this type of case—termination of parental rights. We hold, therefore, that any challenge to Blancett's general authority to sit as a special judge has been waived. *See* Tenn. R.App. P. 36(a).

■ We now turn to Ms. Wallace's challenge to Blancett's authority to sit as a special judge in termination of parental

---

5. In *Ferrell*, released after the hearing in this case, we held that an order appointing a special judge should be either for a specific duration or for a specific case and that a standing order appointing a special judge is not appropriate. 33 S.W.3d at 739. Even though the proper procedure was not followed in *Ferrell*, we held that the special judge was a *de facto* judge and affirmed the judgment below. *Id.* The record does not reflect if Blancett was appointed under a standing order, and there was no objection to his appointment on that basis. After our decision in *Ferrell*, special judges should confirm that their authority to preside is contained in the record.

rights cases. Ms. Wallace argues that "matters related" to a juvenile court referee's duties do not include a termination proceeding because there is no de novo review of that proceeding in the circuit court. *See* Tenn.Code Ann. § 37–1–159. Under § 17–2–118(f)(2), a "judicial officer shall only serve as a special judge in matters related to that officer's duties as a judicial officer." Nothing in § 17–2–118(f)(2) limits a judicial officer's authority as a special judge to cases for which there is de novo review by another trial court. Without any evidence to the contrary, we must assume that a termination proceeding was a matter related to Blancett's duties as a judicial officer. We therefore hold that Ms. Wallace's specific objection to Blancett's authority is without merit. Having concluded that reversal is not required on constitutional or procedural grounds, we must determine whether clear and convincing evidence supports the decision to terminate Ms. Wallace's parental rights.

## GROUNDS FOR TERMINATION

■ The statute governing termination of parental rights sets out a number of grounds for termination. *See* Tenn.Code Ann. §§ 36–1–113(g)(1) through (8). To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest. Tenn.Code Ann. § 36–1–113(c). "Clear and convincing evidence" is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992).

■ We ordinarily review findings of fact of a trial court de novo upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R.App. P. 13(d). When the trial court has not made a specific finding of fact on a particular matter, however, we review the facts in the record under a purely de novo review. *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn.2001). We review all issues of law de novo upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993).

■ In this case, the trial court terminated the parental rights of Ms. Wallace on the grounds that: 1) there was substantial noncompliance with the permanency plans; and 2) the conditions that led to Oliver's removal still persisted, these conditions were unlikely to be remedied, and continuation of Ms. Wallace's parental relationship with Oliver greatly diminished his chances of integration into a stable home. *See* Tenn.Code Ann. §§ 36–1–113(g)(2) and (3). The existence of either one of these statutory grounds will support a termination of parental rights. *See In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn.Ct.App. 2000).

### Substantial Noncompliance

Section 36–1–113(g)(2) of the Tennessee Code Annotated authorizes termination of parental rights when:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4.

Ms. Wallace first argues that not all of her responsibilities under the permanency plans were reasonably related to remedying the conditions necessitating Oliver's foster care placement. Ms. Wallace cites Tenn.Code Ann. § 37–2–403(a)(2)(C), which provides:

Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding the failure of the parent to sign or to agree to such statement if the court finds that the parent was informed of its contents, and *that the requirements of the statement are reasonable and related to remedying the conditions which necessitate foster care placement.*

*Id.* (Emphasis added).

▆▆▆▆ DCS argues that Ms. Wallace cannot attack the terms of her permanency plans because the plans are final, unappealed orders. Alternatively, DCS contends that the issue is waived because Ms. Wallace did not object to the terms in the trial court. An order approving a permanency plan is not a final order. *See In re A.Z. and Z.Z.,* 325 Ill.App.3d 722, 260 Ill. Dec. 53, 760 N.E.2d 132, 135 (2001); *In the Interest of H.R.,* 883 P.2d 619, 621 (Colo. App.1994). Furthermore, a finding of waiver is not appropriate in this case. Ms. Wallace is not appealing the terms of the permanency plans. Her argument is that the trial court failed to find that the terms of the plans with which she had not fully complied were "reasonable and related to remedying the conditions which necessitate foster care placement" under § 37–2–403(a)(2)(C).

▆▆▆▆ A trial court must find that the requirements of a permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn.Code Ann. § 37–2–403(a)(2)(C). We hold that this finding must be made in conjunction with the determination of substantial noncompliance under § 36–1–113(g)(2).

▆▆▆▆ Because the trial court made no finding regarding the reasonableness of Ms. Wallace's responsibilities under the permanency plans, our review of this issue is de novo. Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification. Ms. Wallace had six responsibilities under the permanency plans. We conclude that the following five requirements were reasonable and related to remedying the conditions that necessitating foster care placement in this case: parenting classes, stable housing, supervised visitation, individual counseling, and neuropsychiatric evaluation. We cannot conclude, however, that the requirement that Ms. Wallace attend vocational classes or obtain a GED was reasonable and related to remedying the conditions necessitating foster care placement. The record contains no evidence even remotely suggesting that the abuse of Oliver by Ms. Wallace was related to her lack of vocational training or a GED. Similarly, there is no proof that attending vocational classes or obtaining a GED was related to returning Oliver to Ms. Wallace's care. Accordingly, Ms. Wallace's failure to comply with this requirement is not relevant to a determination of whether there was substantial noncompliance with the permanency plans.

▆▆▆▆ Ms. Wallace next argues that the record does not support the trial court's findings of fact concerning compliance with the requirements of the permanency plan. We review these findings de novo with a presumption of correctness. The trial court found that Ms. Wallace failed to attend parenting classes. We conclude that the evidence preponderates against this finding. At the termination hearing, a DCS representative acknowledged that the last permanency plan indicated that Ms. Wallace had successfully completed a series of parenting classes.

The trial court next found that Ms. Wallace failed to obtain stable housing. We

conclude that the evidence preponderates against this finding as well. The permanency plan required that Ms. Wallace obtain appropriate, stable housing for at least six months. The record shows that Ms. Wallace had lived at the same address, a rooming house, for approximately sixteen months prior to the termination hearing. There was no testimony concerning the appropriateness of the housing itself. The ruling of the trial court, however, reflects its dissatisfaction with Ms. Wallace's housing based upon Mr. Valentine's presence in the home. In finding that Ms. Wallace failed to maintain stable housing, the trial court noted, "There is evidence of some continued abuse in the home by Mr. Valentine as recently as January of this year." The trial court, however, did not appear to discredit the testimony of Ms. Wallace and Mr. Valentine that no abuse had occurred since January 1999, approximately eight months prior to the hearing. Although the trial court was clearly concerned about Mr. Valentine's presence in the home, Ms. Wallace was not required to limit her contact with Mr. Valentine. There was little testimony in the record concerning the details of any prior abuse of Ms. Wallace, and we are unable to conclude, without more, that the prior abuse of Ms. Wallace affected her parenting or her relationship with Oliver. Moreover, no evidence was presented that Mr. Valentine had abused Oliver. In sum, the record does not support a finding that the housing was inappropriate because of Mr. Valentine's presence. We conclude, therefore, that Ms. Wallace complied with the requirement that she maintain appropriate, stable housing for at least six months.

Finally, the trial court found that Ms. Wallace did not maintain a supervised visitation schedule with Oliver. Ms. Wallace visited Oliver regularly in the year prior to the termination hearing, missing just one scheduled supervised visitation. Prior to that time, however, her visitation was irregular and inconsistent. Ms. Wallace did not visit at all for several months before the termination petition was filed. We conclude, therefore, that Ms. Wallace partially complied with the requirement that she maintain a supervised visitation schedule.

The trial court made no findings regarding the requirements that Ms. Wallace attend individual counseling and undergo a neuropsychiatric evaluation. During the termination hearing, however, the trial court noted that Ms. Wallace had not been referred for a neuropsychiatric evaluation. The trial court told the parties that any further questioning about that requirement was not beneficial to the hearing. While Ms. Wallace did not receive individual counseling from the mental health center to which DCS referred her, she obtained counseling on her own. Presumably, the trial court did not consider Ms. Wallace's failure to strictly comply with the counseling requirement to be significant, given the lack of any finding of fact concerning this requirement.

 Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and

substantial noncompliance with such terms is irrelevant.

■ In this case, Ms. Wallace complied with the requirements of attending parenting classes and maintaining stable housing. She partially complied with the requirement of maintaining supervised visitation. Her poor record of visitation prior to the filing of the termination petition stands in marked contrast to her commendable efforts in the year prior to the hearing. Improvement toward compliance should be considered in a parent's favor. *See State Dept. of Human Services v. Defriece*, 937 S.W.2d 954, 961 (Tenn.Ct.App.1996) (stating that decision reversing trial court's termination of parental rights was influenced by evidence of improvement in mother's ability to provide a stable environment for child). Ms. Wallace did not comply with the requirements of attending individual counseling and undergoing a neuropsychiatric evaluation. We assign little weight to these requirements, given the fact that Ms. Wallace was obtaining other counseling and was not referred for a neuropsychiatric evaluation. Of the requirements entitled to significant weight—parenting classes, stable housing, and supervised visitation—Ms. Wallace complied with two and partially complied with the other. We conclude that this proof does not rise to the level of clear and convincing evidence of substantial noncompliance with the requirements of the permanency plans under Tenn.Code Ann. § 36–1–113(g)(2). Therefore, we hold that the trial court erred by relying on this ground for termination of Ms. Wallace's parental rights. We next consider the alternative ground for termination.

### Persistent Conditions

Section 36–1–113(g)(3) of the Tennessee Code Annotated authorizes termination of parental rights when:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

■ There is no dispute that Oliver had been removed for at least six months from the home of Ms. Wallace by order of a court. With regard to factor (i), the trial court concluded that the conditions which led to Oliver's removal still persisted. The trial court did not conclude that other conditions would in all reasonable probability cause Oliver to be subjected to further abuse or neglect. Therefore, with respect to factor (i), we are reviewing only the trial court's conclusion that conditions persisted that prevented the child's safe return to the care of Ms. Wallace.

The condition which led to Oliver's removal was physical abuse by Ms. Wallace. The trial court found that the change that had been suggested in Ms. Wallace's parenting skills did not seem to be a realistic change. The burden of persuasion on this issue rests with DCS, the party seeking to terminate parental rights. *See* Tenn.Code Ann. § 36–1–113(c)(1). The burden was

on DCS, therefore, to show that Ms. Wallace had not learned to control her anger. Even if the trial court did not find credible the testimony of Ms. Wallace's witnesses describing her improved parenting skills, there was no proof that Ms. Wallace was still unable to control her anger. The trial court seemed more concerned that Ms. Wallace continued to live with Mr. Valentine. As we previously noted, there is no evidence that Mr. Valentine had abused Oliver or that Mr. Valentine's prior abuse of Ms. Wallace affected her relationship with and parenting of Oliver. Moreover, Ms. Wallace and Mr. Valentine testified that Ms. Wallace had not been abused in the eight months prior to the hearing. The trial court impliedly credited this testimony but held that this evidence demonstrated that the child would not have an early integration into a stable home.

We cannot conclude that factor (i)—persistent conditions—has been proven by clear and convincing evidence. Because termination of parental rights under Tenn. Code Ann. § 36–1–113(g)(3) requires clear and convincing evidence of all three factors and the proof supporting factor (i) fails to reach this level, consideration of factors (ii) and (iii) is pretermitted. Accordingly, we hold that the trial court erred by terminating Ms. Wallace's parental rights under Tenn.Code Ann. § 36–1–113(g)(3).

## CONCLUSION

We hold that the appointment of a juvenile court referee as a special judge under Tenn.Code Ann. § 17–2–118(f)(2) does not contravene the provision in Article VI, § 4 of the Tennessee Constitution requiring that a judge be elected and that no procedural error occurred in the appointment of the special judge in this case. We further

6. In any such future proceeding, a special judge should confirm that his or her authority

hold that the grounds for termination under Tenn.Code Ann. §§ 36–1–113(g)(2) and (3) have not been proven by clear and convincing evidence. Accordingly, we do not reach the issue of whether termination of Ms. Wallace's parental rights was in Oliver's best interest.

We reverse the judgment of the trial court terminating Ms. Wallace's parental rights and remand for further proceedings. Our ruling does not change custody of Oliver. We leave the decision of custody to the Shelby County Juvenile Court upon remand. Moreover, our ruling does not preclude the filing of a future petition to terminate Ms. Wallace's parental rights.[6] We hold only that the present record does not establish clear and convincing evidence of grounds for termination. Costs of the appeal are taxed to the Tennessee Department of Children's Services.