IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 20, 2013

## IN THE MATTER OF: JUSTIN K., COURTNEY K., EVA K.

**Appeal from the Juvenile Court for Montgomery County**
**No. MCJVCNRC100051288,0051287,0001027      Wayne C. Shelton, Judge**

---

**No. M2012-01779-COA-R3-PT - Filed March 27, 2013**

---

Mother's parental rights to three children were terminated based on her abandonment, failure to comply with family permanency plans the Department of Children's Services developed, and persistence of the conditions that required removal of the children initially. Mother appealed, and we affirm the trial court's judgment. The trial court's findings are supported by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal As Of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Wayne Clemons, Clarksville, Tennessee, for the appellant, J.M.K.

Robert E. Cooper, Jr., Attorney General and Reporter, Marcie E. Greene, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

### I. BACKGROUND

This case involves the termination of J.M.K.'s parental rights to her three children Justin, Courtney, and Eva. The Tennessee Department of Children's Services ("DCS") initially became involved with J.M.K.'s family on July 9, 2010, when J.M.K. was arrested and charged with domestic violence after using a tire iron to break the windows of a vehicle while Justin and Courtney were inside the vehicle. When it became apparent that the children's father was unable to care for the children due to his intoxicated condition, DCS

removed the children from the home and obtained custody of the children.[1]   Justin and Courtney were subsequently declared dependent and neglected . In July 2010 Justin was two years old and Courtney was eleven months old.

DCS began making efforts to reunify the family and developed a Family Permanency Plan with J.M.K.'s assistance on July 22, 2010.  J.M.K. was required to do the following under the plan:  1) attend classes on domestic violence; 2) complete anger management classes; 3) complete parenting classes; 4) complete an alcohol and drug assessment and follow all recommendations; 5) attend an alcohol abuse program; 6) apply for housing; and 7) be able to provide for the children.  J.M.K. signed the permanency plan, affirming she had participated in developing the plan and that she agreed with the plan.  J.M.K. also signed a statement indicating she had received a copy of the Criteria and Procedures for Termination of Parental Rights and was given an explanation of its contents.

A family service worker employed by DCS, Latricia Halls, assisted J.M.K. in her efforts to meet the plan's requirements by helping her obtain a free cell phone with 250 minutes each month through a federal program.  Ms. Halls also provided information to J.M.K. about how to apply for housing in an effort to help J.M.K. obtain stable housing.

J.M.K. initially made progress towards meeting her obligations under the permanency plan, and her children were returned to her for a trial home visit in January 2011.  However, J.M.K. was arrested for driving under the influence ("DUI") during the trial home visit, and complaints were made to DCS alleging J.M.K. and the children's father were both too intoxicated to care properly for the children.  The home visit was terminated in mid-February, and Justin and Courtney were returned to DCS custody.

The children were returned to J.M.K. and the father's home for a second trial home visit in early March.  This home visit was terminated in May 2011 as a result of a referral to DCS alleging the parents were too intoxicated to care properly for Justin and Courtney and that Justin was found wandering around outside unsupervised.

A second Family Permanency Plan was developed in July 2011.  Under this second plan J.M.K. was required to 1) pay child support; 2) provide and maintain running water and electricity in a home without interruptions in service; 3) have a legal means of income; 4) pay her bills in a timely fashion; 5) participate in a new alcohol and drug assessment and continue treatment until treatment goals were met; and 6) participate in an alcohol support group.  As with the first plan, J.M.K. signed the second plan, affirming that she had participated in the

---

[1]The children's father surrendered his parental rights in or about July 2012 and is not a party to this action.

plan's development and agreed with the plan's provisions. J.M.K. also signed another form indicating she had received a copy of the Criteria and Procedures for Termination of Parental Rights.

Unlike the first permanency plan, however, J.M.K. took no steps to satisfy her obligations under the second permanency plan. She did not complete the alcohol and drug assessment, and she failed to provide any financial support for the children. She also failed to obtain stable housing or obtain a legal source of income. J.M.K. lost the home she had during the trial home visit shortly after the visit was terminated. J.M.K. obtained housing elsewhere for a short period, but J.M.K. moved out of that residence before Ms. Halls had an opportunity to inspect it.[2]

Ms. Halls lost contact with J.M.K. shortly thereafter. Ms. Halls called J.M.K.'s parents, her friends, the Salvation Army, and Community Action. Ms. Halls also went to the Salvation Army several times in an effort to locate J.M.K. Every time Ms. Halls tried to call J.M.K., the phone was either out of minutes or not working.

Ms. Halls testified that from September 26, 2011, through January 26, 2012, she saw J.M.K. only once, during a chance encounter outside the public library that was walking distance from the DCS office. Ms. Halls approached J.M.K. and invited her to come to the DCS office to discuss Justin and Courtney, but J.M.K. never went in to meet with Ms. Halls. Ms. Halls testified further that DCS made arrangements for J.M.K. to be able to visit her children every day at the daycare center they attended, but that J.M.K. visited only a handful of times throughout this four-month period. According to Ms. Halls, the last time J.M.K. visited Justin and Courtney was December 3, 2011.

On January 26, 2012, DCS filed a petition to terminate J.M.K.'s parental rights to Justin and Courtney based on J.M.K.'s failure to visit or support her children and her unwillingness to comply with her obligations under the permanency plans. A third Family Permanency Plan was developed in February 2012, after the petition to terminate was filed. The third plan required J.M.K. to 1) pay child support; 2) complete a new alcohol and drug assessment; 3) follow the recommendation(s) of the assessment; 4) develop a relapse plan; 5) be assessed for mental health issues; 6) have a legal means of income to support the children; and 7) have a stable place to live. The plan provided for J.M.K. to visit her children and indicated DCS would assist with transportation and monitor the visits.

The following month J.M.K. gave birth to another child, Eva. A few days after she was born, Eva was taken into state custody as a result of DCS's concerns about J.M.K.'s drug

---

[2]Ms. Halls testified she made three separate attempts to inspect J.M.K.'s home before she moved out.

and alcohol abuse, her lack of stable housing, and her refusal to cooperate with DCS. Eva was declared dependent and neglected in March 2012.[3]

DCS developed a fourth Family Permanency Plan in March 2012. The first three plans covered only Justin and Courtney, and this fourth plan applied to all three children. The fourth permanency plan contained most of the same information and requirements as the third plan. Ms. Halls testified that she attempted to contact J.M.K. to assist with developing the third and fourth permanency plans, but Ms. Halls was unable to locate J.M.K. at those times.

J.M.K. was arrested in May 2012 for burglary, vandalism, and violation of the terms of her probation. DCS filed a petition to terminate J.M.K.'s parental rights to Eva in July 2012. By this time all the children were living together with foster parents and the permanency plan listed adoption as a permanent goal in addition to family reunification.

At the time of the termination hearing J.M.K. was incarcerated in Montgomery County where she was serving a sentence for her probation violation. She was awaiting sentencing on her burglary and vandalism charges. J.M.K. testified that she suffers from bipolar disorder and that she is not supposed to consume alcohol while she is taking her bipolar medication.

## II. TRIAL COURT PROCEEDINGS

Following a trial at the end of July 2012 the trial court entered an order terminating J.M.K.'s parental rights to Justin, Courtney, and Eva. The court concluded there was clear and convincing evidence to support the termination of J.M.K.'s parental rights and that termination was in the best interest of the children. The grounds for termination included abandonment, as defined by Tenn. Code Ann. § 36-1-113(g)(1); substantial noncompliance with the statement of responsibilities in the permanency plans, as set forth in Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2); and conditions that led to the children's removal still existed that prevented return of the children to J.M.K., as set forth in Tennessee Code Annotated § 36-1-113(g)(3).

In conducting the best interest analysis, the trial court considered the statutory factors set forth in § 36-1-113(i) and concluded it was in the children's best interest to terminate J.M.K.'s parental rights. The trial court thus entered an order terminating J.M.K.'s parental rights to Justin, Courtney, and Eva.

---

[3]Ms. Halls testified J.M.K. did not visit Eva after she was taken into DCS custody or make any phone calls to find out how she was doing.

J.M.K. appeals the trial court's order and raises the following issues on appeal:

1.  Did the State prove notice of the definition and potential consequences of abandonment as required by Tenn. Code Ann. § 37-2-403?

2.  Did J.M.K. abandon her children by willfully failing to visit or support them?

3.  Did J.M.K. abandon her children by engaging in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the children?

4.  Did J.M.K. fail to substantially comply with the Permanency Plan?

5.  Is termination of parental rights in the best interest of the children?

### III. ANALYSIS

### A. Standards for Terminating Parental Rights

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The state may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Persons seeking to terminate another's parental rights must prove two things. Tennessee Code Annotated § 36-1-113(c) requires that termination of parental rights must be based upon: (1) A finding by the court by clear and convincing evidence that the grounds

for termination of parental rights have been established; and (2) that termination of the parent's rights is in the best interests of the child.

Both grounds and best interests must be proved by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 250 ; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *Santosky*, 455 U.S. at 769, and its purpose is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622.

> Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d at 861, and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.*, 319 S.W.3d at 596.

In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

The party seeking termination must establish the existence of only one statutory ground to support a termination. *In re Angela E.*, 303 S.W.3d at 251; *In re Valentine*, 79 S.W.3d at 546. Only if at least one ground is established by clear and convincing evidence does the trial court or the reviewing court conduct a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. As we have stated before, existence of a ground does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child. *In re C.B.W.*, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

Statutory factors are set out for the best interests analysis that the court "shall consider," but that analysis "is not limited to" the factors enumerated in the statute. Tenn. Code Ann. § 36–1–113(i); *In re Angela E.*, 303 S.W.3d at 251; *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right to be

terminated. The relevance and weight to be given each factor depends on the unique facts of each case. In some cases one factor alone may be sufficient to determine the outcome. *In Re Audrey S.*, 182 S.W.3d at 878.

Appellate courts review the trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Thus, reviewing courts will review the trial court's findings of fact *de novo* on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

In light of the heightened burden of proof in termination proceedings, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported the evidence, provide clear and convincing evidence that supports all the elements necessary to terminate a parent's rights. *In re Bernard T.*, 319 S.W.3d at 597. A reviewing court must review "the trial court's ruling that the facts of [a] case sufficiently support the termination ground. . . .," a conclusion of law, *de novo* with no presumption of correctness. *In the Matter of M.L.P.*, 281 S.W.3d at 393 (quoting *In re A.M.H.*, 215 S.W.3d at 810).

## B. Notice that Abandonment May Lead to Termination

J.M.K. first alleges DCS has failed to prove it satisfied the notice requirements of Tenn. Code Ann. § 37-2-403, which addresses family permanency plans when children are placed in foster care. That statute requires that each such plan include in its statement of parent responsibilities "the definitions of 'abandonment' and 'abandonment of an infant'" and the criteria and procedures for termination of parental rights. Tenn. Code Ann. § 37-2-403(a)(2)(A). The provision also requires that each party shall sign the statement and be given a copy of it.

As set forth above, the first and second Family Permanency Plans DCS developed with the assistance of J.M.K. included the following statement that J.M.K. signed: "I have received a copy of <u>Criteria & Procedures for Termination of Parental Rights</u> and have been given an explanation of its contents." (Emphasis in original.)

However, on appeal J.M.K. contends that none of the four permanency plans that appear in the record shows J.M.K. signed a portion of a permanency plan that describes the criteria for abandonment. However, the record contains the statement quoted above and signed by J.M.K.

It is important to point out that the Petition to Terminate Parental Rights DCS filed in January 2012 with respect to Justin and Courtney included the following statement:

> [J.M.K. and her husband] attended the Permanency Plan Meeting on July 25, 2011 and were advised at that meeting that willful failure to visit or contribute to the support of the child for four (4) consecutive months was grounds for termination of parental rights when Latricia Halls reviewed the Criteria and Procedure for Termination of Parental Rights with them.

The Petition to Terminate Parental Rights DCS filed with respect to Eva in July 2012 included a similar statement:

> [J.M.K. and her husband] have attended the Permanency Plan Meeting on their children, Courtney and Justin on July 25, 2011 and were advised at that meeting that willful failure to visit or contribute to the support of the child for four (4) consecutive months was grounds for termination of parental rights when Latricia Halls reviewed the Criteria and Procedure for Termination of Parental Rights with them. They have not attended any meetings or court proceedings on Eva since the First Appearance in her case.

The record does not reflect J.M.K. filed a response to either petition denying these statements. Nor did she assert at any time either at trial or prior to her appeal that the notice requirements of § 37-2-403 had not been followed in any respect. In addition, J.M.K.'s attorney did not question J.M.K. or DCS's representative at trial about whether J.M.K. had been informed as to the definition of abandonment or the procedures for termination of parental rights.

"Issues not raised in the trial court cannot be raised for the first time on appeal." *Correll v. E.I. DuPont de Nemours & Co.*, 207 S.W.3d 751, 757 (Tenn. 2006) (quoting *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991)). J.M.K. has thus waived her right to argue on appeal that proper notice was not given to J.M.K. of the effects of abandoning her children.

Finally, the notice provisions of Tenn. Code Ann. § 37-2-403 only come into play when a parent's termination is based on abandonment. *State Dep't of Children's Servs. v. K.W.C.*, 2007 WL 2198593, at *9 (Tenn. Ct. App. Aug. 1, 2007). The notice of grounds is limited to abandonment. Since we affirm the trial court's termination of J.M.K.'s parental rights on a ground other than abandonment, this notice requirement irrelevant in any event.

### C. J.M.K. Failed to Comply Substantially with the Permanency Plans

-8-

The trial court terminated J.M.K.'s parental rights on the grounds of 1) abandonment; 2) substantial noncompliance with the permanency plans; and 3) the conditions that led to the children's removal still persisted, these conditions were unlikely to be remedied, and continuing J.M.K.'s parental relationship with the children greatly diminished their chances of integration into a stable home. Proof of just one of these grounds by clear and convincing evidence will support the termination of J.M.K.'s parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re Valentine*, 79 S.W.3d at 546.

The statutory provision creating a ground for termination based upon noncompliance with a permanency plan states:

> There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . .

Tenn. Code Ann. § 36-1-113(g)(2).

J.M.K. contends the trial court found J.M.K. failed to comply substantially with a number of requirements of the permanency plans, but that the court failed to specify which permanency plans, and which specific requirements, she failed to comply with.

The trial court stated the following in its order terminating J.M.K.'s parental rights:

> After the children came into state's custody, DCS created a permanency plan for the children and family. Plans were created after Justin and Courtney came in to custody in July 2010 and when Eva entered custody in February 2012. The permanency plans listed a number of requirements that Respondent needed to satisfy before the children could safely be returned home.

> The responsibilities for [J.M.K.] were reasonably related to remedying the reasons for foster care.

> [J.M.K.] has not substantially complied with the responsibilities and requirements set out in the permanency plans. DCS made reasonable efforts to help [J.M.K.] to satisfy the requirements in the permanency plan.

When an individual's parental rights are terminated for substantial noncompliance with a permanency plan, there must be a determination that the requirements of the permanency plan are "reasonable and related to remedying the conditions that necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(c)); *see In re M.J.B. and M.W.S., Jr.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)

(same). In addition, a parent-child relationship will not be terminated unless the parent's noncompliance is substantial, measured by both the degree of noncompliance and the weight assigned to the particular requirements. "[N]oncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody will be deemed to be 'substantial.'" *In re Z.J.S. and M.J.P.*, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003).

The trial court expressly found that J.M.K.'s responsibilities under the permanency plans "were reasonably related to remedying the reasons for foster care." J.M.K. does not question this finding, and we agree with the trial court's determination on this issue. The second permanency plan was developed after J.M.K.'s children were removed from the trial home visit because J.M.K. was too intoxicated to care for them, among other reasons. In addition to the basic requirements of being able to support her children and provide them with a stable home with running water and electricity, the second, third, and fourth permanency plans required J.M.K. to address her problems with alcohol and have a legal means of income. There requirements are clearly reasonably related to remedying the conditions that led to J.M.K.'s children being placed in foster care.

Ms. Halls testified that J.M.K. did not satisfy any of the requirements of the second, third, or fourth permanency plans, and J.M.K. did not introduce any evidence suggesting she complied with any of the requirements. She argues, instead, that her health and poverty prevented her from paying support.

Evidence was introduced that J.M.K. suffered from a health problem that made it uncomfortable to walk, but Ms. Halls testified she offered to provide bus passes to J.M.K. and also offered to give her rides to assist her in meeting her obligations under the permanency plans.[4] There was also evidence that J.M.K. suffered from a bipolar disorder, but J.M.K. testified she was taking medication for this condition. Of course, the requirement of support was only one of the requirements in the plans.

Ms. Halls testified she gave J.M.K. information about obtaining housing with the assistance of an organization called Community Action, but no evidence was introduced that J.M.K. ever contacted this organization or took other steps to obtain housing for her and her children. Ms. Halls also testified she provided J.M.K. with a free cell phone with 250 minutes per month. J.M.K. introduced no evidence indicating she took any steps to find

---

[4]The children's father took advantage of the opportunity to get bus passes one time, but J.M.K. never requested any passes.

-10-

either housing or a job.[5]

Based on the evidence introduced at trial, we affirm the trial court's finding that DCS has established J.M.K.'s noncompliance with the requirements of the second, third, and fourth permanency plans by clear and convincing evidence.

### D. Best Interests of the Children

Having concluded that grounds exist to terminate J.M.K.'s parental rights to Justin, Courtney, and Eva, we next consider whether it is in the best interests of the children to terminate J.M.K.'s rights.[6] DCS has the burden of proving by clear and convincing evidence that termination of J.M.K.'s parental rights is in the best interest of the children. *In re Angela E.*, 303 S.W.3d at 250.

The legislature has codified certain factors that courts are to consider in ascertaining whether it is in a child's best interest to terminate a parent's rights:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

---

[5]The trial court's findings, which are supported by the record, included the following:

The Department made reasonable efforts for two years to engage the mother, [J.M.K.] to rectify the situation that brought the children into care. [J.M.K.] has not availed herself of the services offered by the Department even though the Department offered her: unlimited visitation with her children at their daycare; bus passes; helped her obtain a free cell phone to stay in touch with the Department; and even sent the children on a trial home visit, which was disrupted due to the parents' continued intoxication and Justin found wandering the street unsupervised.

[6]J.M.K. raises this as an issue on appeal, but she failed to present any argument on this issue in her brief. Although J.M.K. waives this argument by failing to brief the issue, we exercise our discretion to address the issue due to the gravity of the determination.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to §36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The trial court considered these factors and found the following:

2. The Respondent, [J.M.K.] has not made changes to her conduct or circumstances that would make it safe for the children to go home. Specifically, Justin and Courtney have had no contact with [J.M.K.] since December 3, 2011; Eva has had no contact with [J.M.K.] since February 24, 2012; [J.M.K.] is not in compliance with the permanency plan; and [J.M.K.] is incarcerated.

3. The Respondent, [J.M.K.] has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite the reasonable efforts from the state for a period of almost two years, [J.M.K.] knew her children were in state custody, yet she has made no effort to visit, support or establish a relationship with them.

4. The Respondent, [J.M.K.], has not maintained regular visitation with the children such that a parent-child bond remains.

5. The Respondent, [J.M.K.] has shown little or no interest in the welfare of the children and has abandoned the care of the children to the state.

6. Latricia Halls testified that the children are in a foster home that loves them and wishes to adopt them.

The evidence supports these findings. Further, J.M.K. was arrested for domestic violence when the children were initially removed from the home and was arrested for DUI, burglary, vandalism, and two other probation violations after the children were removed. Justin and Courtney have not lived with J.M.K. since July 2010 (other than two short-lived home trial visits), and Eva has never lived with J.M.K.

For all of these reasons, we conclude DCS has proved by clear and convincing evidence that terminating J.M.K.'s parental rights to Justin, Courtney, and Eva is in the children's best interests. We therefore affirm the trial court's judgment.

## IV. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment terminating J.M.K.'s parental rights to Justin, Courtney, and Eva. Costs of this appeal shall be taxed to the appellant, J.M.K.

_____
PATRICIA J. COTTRELL, JUDGE